# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CAUSE NO.: 1:10-CR-21-TLS |
| | ) | |
| TERRY L. SABO, JR. | ) | |

## OPINION AND ORDER

Before the Court is a Motion to Suppress [ECF No. 40], filed on December 17, 2010. The Defendant, Terry L Sabo, Jr., asks the Court to exclude evidence that police seized from his residence on February 12, 2010. For the reasons stated in this Opinion and Order, the Defendant's Motion to Suppress is denied.

## BACKGROUND

On March 24, 2010, the Government filed a three-count Indictment charging that the Defendant, on or about February 12, 2010, possessed with intent to distribute marijuana, possessed a firearm in furtherance of a drug trafficking crime, and possessed a firearm having already been convicted of a felony. On December 17, 2010, the Defendant filed a Motion to Suppress evidence that was seized from his residence. The Defendant argued that law enforcement officers did not have a warrant, probable cause, or consent to enter and search his residence. In a Response filed on January 7, 2011, the Government submitted that testimony adduced at a hearing would establish that the Defendant consented to the entry of law enforcement officers into his trailer. The Government also argued that, absent consent, the smell of marijuana coming from inside the trailer gave rise to probable cause, and that the police would have inevitably discovered the evidence at issue through lawful means.

The Court conducted an evidentiary hearing on February 23. The Court heard testimony from Deputy United States Marshals Timothy Fraley and Michael Evett, and Kosciosko County Sheriff's Department Detective Donald McCune. The Court continued the hearing so the Defendant could secure the attendance and testimony of April Sabo, the Defendant's wife who was in the process of divorcing him. On March 3, the Defendant presented the testimony of April Sabo and the Government called Detective McCune as a rebuttal witness.

On May 6, the Defendant filed his Brief [ECF Nos. 52 & 53] in support of the Motion to Suppress. On June 6, the Government filed its Response to Defendant's Motion to Suppress [ECF No. 54] and on June 23 the Defendant filed his Reply [ECF No. 55].

**STATEMENT OF FACTS**

Based upon the evidence presented at the hearing on the Motion to Suppress, the Court finds the following to be the relevant, credible facts:

Deputies Fraley and Evett are assigned to the United States Marshal Service for the Northern District of Indiana, Fort Wayne Division. In January 2010, the Marshal Service for the Southern District of Indiana asked them to assist in finding Jeffrey Reames, who was the subject of an arrest warrant for a parole violation. Deputy Fraley learned that Reames might be staying with his stepfather, Terry Sabo, in Warsaw, Indiana, at a particular address. This information was gathered from Reame's ex-girlfriend, and it matched the address that Reames had provided to officials as his intended residence during his period of parole.

On February 12, Deputies Fraley and Evett went to Sabo's address in Warsaw looking for Reames. Deputies Fraley and Evett approached the trailer and Deputy Fraley knocked on the

door When Sabo answered, Deputy Fraley introduced himself, showed his identification, and said he was there about Sabo's stepson, Reames. Deputy Fraley asked Sabo if he could come in to talk about Reames and Sabo answered that Reames was not inside the trailer. Both deputies detected a very strong odor of marijuana coming from the trailer and heard several voices. The voices included children and at least one adult, which the deputies could not distinguish as male or female. After hearing the voices, Deputy Fraley asked Sabo if anyone else was present in the trailer and Sabo responded that it was just him and his kids. He did not acknowledge that any other adult was with the children. Deputy Fraley asked Sabo if he was smoking dope with children in the house. Sabo responded by telling Deputy Fraley to "get the f**k out of here," and slammed the door.

The Deputies backed away from the trailer and moved their vehicle behind a shrub line so that anyone inside the trailer could not see them. They did not know if Reames was inside the trailer and, in their experience, people often lied about the whereabouts of fugitives. Reames was known to be armed and dangerous. Deputy Fraley called the Warsaw dispatch and Kosciosko County Sheriff's Office, and officers responded to Sabo's address within minutes.

Detective McCune, one of the responding officers, was familiar with the address from previous contacts with Sabo and his wife, April Sabo. Detective McCune knew that Sabo was a convicted felon. After being advised that the Deputies were looking for Reames and that Sabo had slammed the door on them, he went to the door of the trailer and knocked and announced that he was with the Sheriff's Department. Sabo opened the door and Detective McCune identified himself to Sabo, reminded him that they had seen one another before, and asked Sabo if he could step inside and talk to him. Sabo did not answer, but stepped back and to the side and

let the door come open. Detective McCune stepped inside. With the door open and as he was stepping inside, Detective McCune smelled a strong odor of marijuana. Also, straight across the hall from where Detective McCune stood he saw three or four long guns resting against the wall. Detective McCune asked Sabo to sit down on a nearby couch until officers could secure the guns. Officers on the scene, including Deputies Fraley and Evett, entered the trailer behind Detective McCune and conducted a sweep of the trailer looking for Reames. The only other people they located inside the trailer were April Sabo and her children. Detective McCune then took steps to secure a search warrant on the basis of the marijuana smell. Once the warrant was signed, deputies began a search for marijuana. The Defendant seeks to suppress the marijuana and firearms that the deputies seized during this search.

## DISCUSSION

When someone with authority to do so consents to the entry of police into his home, that entry is reasonable and the Fourth Amendment is not violated. *United States v. Walls*, 225 F.3d 858, 862 (7th Cir. 2000) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). The Defendant asserts that his nonverbal actions were not sufficient to imply that he consented to Detective McCune's entry. The Defendant acknowledges that consent "may be manifested in a non-verbal as well as a verbal manner," *Walls*, 225 F.3d at 863, but argues that he did not take any action that manifested consent. The Defendant has identified three issues that he believes require resolution in relation to his Motion to Suppress: (1) whether the Defendant answered and opened the door for Detective McCune or whether Detective McCune entered on his own; (2) whether, if Detective McCune's account is believed, the Defendant's actions manifested consent;

4

and (3) the scope of any consent.[1]

For the first issue, which is a factual dispute regarding Detective McCune's and Sabo's actions that the Court must resolve, the Defendant relies on the account given by April Sabo at the suppression hearing. April Sabo testified that when the officers came into the trailer, she was in the bedroom changing diapers, but could still see the front door. She said that the Defendant did not go to the door to let any officer inside, but was either in the bathroom or had just come out of the bathroom when the officers entered without knocking. This testimony contradicts the testimony of Detective McCune, Deputy Fraley, and Deputy Evett, who all testified that the Defendant answered the door for Detective McCune.

After observing the demeanor of all the witnesses and the totality of their testimony, the Court credits the law enforcement agents' version of events. Their testimony was internally consistent as well as with each other, and their answers were straightforward. Detective McCune testified that when he asked the Defendant if he could come inside and talk, the Defendant "didn't say 'yes', but he stepped back and let the door come open and I took one step just inside the door." (Feb. 23, 2001, Suppression Hr'g Tr. at 60.) Concerning Detective McCune's entry into the trailer, Deputy Fraley testified as follows:

> Q. And were you able to tell, either by words or by body language, whether Mr. Sabo had stepped aside or exactly how it is they gained entrance into the trailer?
> A. It almost looked like they were friends. I mean, they obviously knew each other. I think Mr. Sabo knew the officer's first name. He called it several times. Um, they basically walked in the trailer together, almost as if Terry stepped aside and allowed him in.

---

[1] Any consent to enter must be voluntary and not the product of duress or coercion. *Walls*, 225 F.3d at 862. The Defendant expressly states that he is not challenging whether his alleged nonverbal response to Detective McCune's request to enter his house was voluntary.

5

(Feb. 23, 2011, Suppression Hr'g Tr. at 12.) Similarly, Deputy Evett gave the following account:

> Q. Did it appear from your vantage point that the officer on the porch did anything forceful to get by Mr. Sabo to get into the trailer?
> A. Not at all.
> Q. Did it appear from your vantage point that Mr. Sabo had either moved to the side or acquiesced to the officer coming into the trailer?
> A. Yes, after they had the brief conversation on the porch, Terry had turned and walked in and the officer followed in with him.

(Feb. 23, 2011, Suppression Hr'g Tr. at 42.) He stated that from his vantage point, it looked like the Defendant "kind of moved back into the trailer, um, then and allowed [Detective McCune] to come in with him." (*Id.* at 49.)

In comparison, April Sabo was less than forthright and attempted to distance herself from events and items inside the trailer. She testified that nothing was growing in the back of the trailer where officers found a live marijuana plant. She testified that she could not smell the marijuana in the trailer that three other witnesses testified was creating a very strong odor. Detective McCune testified that, because he received injuries to his nose, an odor was very strong if he was able to detect it. Later in April Sabo's testimony, when she was asked whether she had an opinion concerning what was in a box depicted in a photograph marked as Government's Exhibit 2 she pled "the fifth," and when asked if she could smell anything coming out of the box depicted in the photograph she denied that she could but blamed it on having a cold. (March 3, 2011, Suppression Hr'g Tr. at 27.) Government's Exhibit 2 is a picture of a box filled with a green, leafy, substance that Detective McCune testified, based on his training and experience, had the appearance and odor of marijuana. In addition, although April Sabo said that she could see the front door from the bedroom, she also testified that she was changing the diapers of both her one and two-year-old children. As she was attending to her children, it is

6

reasonable to conclude that she was not focused solely on the front door and may have missed the brief exchange between the Defendant and Detective McCune. In comparison, it is not believable to this Court that a detective with more than fifteen years of experience in law enforcement walked up to a residence and entered it without so much as announcing his presence, knocking on the door, or asking any questions of the occupants, and that two experienced Deputies from the United States Marshal Service then simply followed him inside without any indication that the detective had made contact with the Defendant. Such conduct is even more unbelievable given that each of the law enforcement officials testified that if permission to enter had not been granted, they already had sufficient probable cause to get a search warrant and would have sought one from a local judicial officer. When asked why he contacted the local sheriff's department, Deputy Fraley testified that he wanted vehicles at their location as quickly as possible because the deputies were in a bad tactical position by themselves and because he wanted to talk to a detective about obtaining a search warrant.[2] For all the above reasons, the Court credits the testimony of the law enforcement officials that the Defendant answered the door and stepped back in response to Detective McCune's inquiry whether he could come inside.

Regarding the second issue, whether the Defendant's non-verbal actions constituted sufficient consent, the Defendant argues that his actions are distinguishable from those that formed the implied consent in *United States v. Walls* because the Defendant did not make any

---

[2] After their initial encounter with the Defendants, the deputies believed they could obtain a warrant based on the odor of marijuana and because a fugitive could be inside the trailer. In addition to the information provided to the deputies indicating that Reames was living at the trailer, the Defendant told Deputy Fraley that his children were the only other people inside even though Deputies Fraley and Evett both heard another adult voice coming from inside the trailer.

inviting gestures with his hands. In *Walls*, the Court of Appeals for the Seventh Circuit held that the defendant's act of opening a door and stepping back to allow law enforcement agents to enter constituted consent. 225 F.3d at 862–63 (citing as an example of sufficient non-verbal manifestation of consent *United States v. Rosario*, 962 F.2d 733 (7th Cir. 1992), where the occupant of a motel room gestured for the officers to enter, stepped back, and opened the door). The *Walls* court then added that the defendant's consent was "further illustrated by her actions after [the agents] entered the residence in motioning for them to follow her to the kitchen where she could speak with them privately." 225 F.3d at 863.

The gesturing mentioned in *Walls* was not necessary to manifest consent to enter. The gesturing did not even occur until after the agents were already inside the house and thus could not have provided the justification for their initial entry. Rather, it was sufficient that, in response to agents' statements that they were conducting an investigation regarding two packages that had been delivered, the defendant opened the door and stepped back. The Court finds that, in the same way, the Defendant manifested consent for Detective McCune to enter the trailer. When the Defendant answered the door he was standing in the doorway, blocking the entrance. It would not have been possible for Detective McCune to enter the trailer without first forcibly moving the Defendant out of the way. When Detective McCune asked if he could come inside to talk to the Defendant, the Defendant did not say anything, but stepped back and to the side and let the door come further open. If Detective McCune misinterpreted what the Defendant intended to communicate by his actions, the Defendant did not attempt to correct him. Detective McCune did not violate the Defendant's Fourth Amendment rights when he entered his home because the Defendant's actions were sufficient to manifest consent to enter.

Lastly, the Defendant argues that if the Court finds that Detective McCune accurately described the events, the Court must still determine the scope of the consent manifested by the Defendant's act of stepping aside and allowing Detective McCune to enter. The Defendant argues that any consent was limited to entering the trailer and did not extend to a search of the trailer. He contends that the Deputies' immediate entry behind Detective McCune and sweep for Reames was unreasonable because they had no reasonable basis for believing that Reames was living at the trailer.

To remain reasonable, a search that is predicated upon consent must stay within the boundaries of the consent given. The scope of consent is "limited by the breadth of actual consent." *United States v. Long*, 425 F.3d 482, 486 (7th Cir. 2005); *United States v. Raney*, 342 F.3d 551, 556 (7th Cir. 2003); *United States v. Torres*, 32 F.3d 225, 230–31 (7th Cir. 1994). It is not necessary, however, for the Court to discuss the validity of the sweep or whether it was within the scope of the Defendant's consent. Once Detective McCune stepped inside the trailer, he immediately saw three to four long guns inside the trailer. The incriminating character of the guns was immediately apparent because Detective McCune knew that the Defendant was a convicted felon. *See United States v. Curlin*, 638 F.3d 562, 566 (7th Cir. 2011) (noting that the incriminating nature of guns that officers observed in plain view was immediately apparent because the officers learned that the defendant was a convicted felon before arriving at his residence and seeing the guns). This knowledge of the Defendant's criminal history provided probable cause to arrest the Defendant for being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1) (making it unlawful for any person who has been convicted of a felony to possess in or affecting commerce any firearm or ammunition); *United States v. Breit*, 429 F.3d 725, 728

(7th Cir. 2005) ("Probable cause exists if, at the time of arrest, the officers possess knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that a suspect has committed, or is committing, a crime."). In addition, and regardless of the protective sweep, the guns and the strong odor of marijuana provided "fair probability that contraband or evidence of a crime [would] be found" in the trailer. *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (providing the probable cause standard for conducting a search ). In determining whether the circumstances provided probable cause to search his residence, the deputies were entitled to draw inferences based on their training and experience, *United States v. Elst*, 579 F.3d 740, 746 (7th Cir. 2009), which included their experience and familiarity with drugs. Based on observations the Deputies made before entering the trailer, a warrant was secured for the residence.[3] During the execution of the search warrant, officers seized the firearms located in the living room, additional firearms, and marijuana.

Because nothing that the Deputies observed during their sweep of the trailer was necessary to justify their reasonable belief that the Defendant had committed a crime or that a search of the trailer would uncover evidence of the criminal activity, nothing they observed during their sweep was necessary to justify their later seizure of those items and other contraband pursuant to a search warrant. Accordingly, even if some aspect of their protective sweep was unlawful, it does not justify exclusion of the recovered contraband. *See United States v. Stotler*, 591 F.3d 935, 940 (7th Cir. 2010) (holding that under the inevitable discovery doctrine, "even an illegally seized item need not be suppressed if the government can prove by a

---

[3] The Court does not have a copy of the search warrant issued by the Kosciusko Superior Court. The testimony from the evidentiary hearing is that the warrant was obtained based on the smell of marijuana. (Feb. 23, 2011, Supp. Hr'g Tr. 63–64.)

preponderance of the evidence that the officers would have discovered it by lawful means") (citing *Nix v. Williams*, 467 U.S. 431 (1984), and *United States v. Marrocco*, 578 F.3d 627 (7th Cir. 2009)). The exclusionary rule "should not be used to make the person whose rights have been violated better off than he would be if no violation had occurred." *United States v. Brown*, 328 F.3d 352, 357 (7th Cir. 2003) (citing *United States v. Salgado*, 807 F.2d 603, 607 (7th Cir. 1986)). None of the evidence in this case was obtained in violation of the Defendant's Fourth Amendment rights and, to the extent there was a violation, exclusion is not an appropriate remedy.[4]

---

[4] In addition to discussing the issue of consent and the inevitable discovery doctrine, the Government argues that the smell of marijuana gave the police probable cause to search the trailer. The Government cites several cases where the smell of drugs has given rise to probable cause to search a vehicle, and then cryptically asserts that "[i]t is the government's position that this also applies to the search of a residence."(Gov't Response to Def.'s Mot. to Suppress 3–4, ECF No. 54.) It is not clear what the Government means by "this also applies to a search of a residence." It may be that the Government is saying that the smell of marijuana can be the basis for probable cause upon which to seek a warrant. This would not be an objectionable position. However, it appears that the Government offers its argument with a much broader purpose—as an attempt to justify a warrantless search of a residence based upon the smell of marijuana—as the Government does not include the standard for probable cause in its analysis and only cites cases involving searches conducted without a warrant. The Government's analysis consists wholly of an excerpt from *United States v. Mosby*, 541 F.3d 764, 768–69 (7th Cir. 2008), where the court cited to five different automobile search cases and held that a police officer's smelling of marijuana as he stood next to a validly stopped vehicle was enough to give rise to probable cause to search the entire vehicle. The Defendant, like the Court, interpreted the Government's concluding statement that "this also applies to the search of a residence" as an attempt to create a new warrantless search exception when the Government presented this argument verbatim in briefing submitted to the Court before the evidentiary hearing. (Gov't Response to Def.'s Mot. to Suppress 4, ECF No. 46.) In response, the Defendant argued that residences are entitled to more protection from warrantless searches than are automobiles, and that warrantless searches of homes are presumed unlawful unless the government demonstrates both probable cause and exigent circumstances. The Government repeated its argument without responding to the Defendant's arguments or clarifying that the scope of its argument was intended to be different. Accordingly, the Court will address the Government's argument to make clear that the Court's Opinion and Order should not be interpreted as agreement with the Government's position regarding warrantless searches of residences.

The Government provides no legal citation in support of its bold position that probable cause alone justifies a warrantless entry and search of a residence. The automobile exception is specifically tailored to the unique circumstances presented by an automobile—its mobility and the diminished expectation of privacy as compared to one's home or office. *California v. Carney*, 471 U.S. 386, 391 (1985); *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004) (holding that as long as the vehicle

## CONCLUSION

For the reasons stated above, the Court DENIES the Defendant's Motion to Suppress [ECF No. 40]. A Telephonic Final Pretrial Conference (FPTC) is scheduled for Monday, July 18, 2011, at 11:00 AM. The Court will initiate the call. The deadline for filing any plea agreement is the date of the FPTC. A jury trial is scheduled to begin on Tuesday, July 26, 2011, at 8:30 AM before Judge Theresa L. Springmann.

SO ORDERED on July 11, 2011.

s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION

---

"was inherently, even if not immediately, mobile, the application of the automobile exception was still valid based on the diminished expectation of privacy in one's vehicle"). The reasons that a less rigorous warrant requirements may be applied to a vehicle do not carry over to the home. It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quotation marks omitted). The Fourth Amendment permits "an officer to enter a house without a warrant where there is (1) probable cause supporting the entry; *and* (2) exigent circumstances." *United States v. Venters*, 539 F.3d 801, 806–07 (7th Cir. 2008) (emphasis added). It is the combination of these factors that justifies a warrantless entry, and the Government's poorly defined argument makes no provision for the necessary element of exigency.